UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| United States of America | No. 19-CR-20626 |
| Plaintiff, | HONORABLE NANCY G. EDMUNDS |
| v. | |
| D-4 FCA US LLC | Offense: Conspiracy |
| Defendant. | Violation: 18 U.S.C. § 371 |
| | Statutory Maximum Period of Probation: Five years |
| | Statutory Minimum Period of Probation: None/Not Applicable |
| | Statutory Maximum Fine: 18 U.S.C. § 3571(d) (the greater of twice the gross gain or twice the gross loss) |
| | Statutory Minimum Fine: None/Not Applicable |

- - - - - - - - - - - - - - - - - - - - - - - - X

## **PLEA AGREEMENT**

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), and the Defendant, FCA US LLC ("FCA" or "the Defendant"), by and through its undersigned attorneys, and through its authorized representative,

pursuant to authority granted by the Defendant and with the consent of the Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

**1.     Guilty Plea**

**A.     Waiver of Indictment and Venue and Agreement to Plead Guilty**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of Michigan, and to plead guilty to a criminal Information, which charges the Defendant with one count of conspiracy to defraud the United States, to commit wire fraud, and to violate the Clean Air Act, all in violation of Title 18, United States Code, Section 371. The Defendant agrees to persist in its plea of guilty through sentencing.

**B.     Elements of Offense**

The Defendant understands that to be guilty of this offense, the following essential elements of the offense must be satisfied:

1.     The elements for conspiracy to violate the wire fraud statute and Clean Air Act are as follows:

i.     Two or more persons conspired, or agreed, to commit a crime, in this case, a violation of the wire fraud statute (18 U.S.C.

2

§ 1343) and the Clean Air Act (42 U.S.C. § 7413(c)(2)(A)) as described below;

 ii. The defendant knowingly and voluntarily joined the conspiracy; and

 iii. A member of the conspiracy performed one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

*Object of the Conspiracy – Wire Fraud – 18 U.S.C. § 1343:*

 i. The defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property for the defendant or others;

 ii. The scheme included a material misrepresentation or concealment of a material fact;

 iii. The defendant had the intent to defraud; and

 iv. The defendant used (or caused another to use) wire, radio or television communications in interstate or foreign commerce in furtherance of the scheme.

*Object of the Conspiracy – Clean Air Act – 42 U.S.C. § 7413(c)(2)(A)*

  i. The defendant knowingly made (or caused to be made) a false material statement, representation, or certification, or omission of material information;

  ii. The statement, representation or certification that was made (or omitted), or caused to be made or omitted, was in a notice, application, record, report, plan or other document required to be filed or maintained under the Clean Air Act; and

  iii. The statement, representation, certification, or omission of information was material.

2. The elements for conspiracy to defraud the United States by obstructing the lawful function of the federal government are as follows:

  i. Two or more persons conspired, or agreed, to defraud the United States or one of its agencies or departments, in this case, the Environmental Protection Agency ("EPA"), by dishonest means;

  ii. The defendant knowingly and voluntarily joined the conspiracy; and

  iii. A member of the conspiracy performed one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

4

### C. Statutory Maximum Penalties

The statutory maximum sentence that the Court can impose upon the Defendant for a violation of Title 18, United States Code, Section 371 is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

### D. Factual Basis for Guilty Plea

The Defendant is pleading guilty because it is guilty of the charge contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment B ("Statement of Facts") are true and correct, that it is responsible for the acts of its employees and agents described in the Information and Attachment B, and that the Information and Attachment B accurately reflect the Defendant's criminal conduct. The Defendant agrees that it will neither contest the admissibility of, nor contradict, the Statement of Facts contained in Attachment B in any proceeding.

## 2. Sentencing Guidelines

### A. Standard of Proof

The Court will determine all sentencing factors by a preponderance of the evidence.

5

## B. Guideline Range

The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"). The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). There are no sentencing guideline disputes between the parties in this case. The parties' agreement herein to the guideline sentencing factors set forth below constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant understands that, if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 3.

The Offices and the Defendant agree that a faithful application of the U.S.S.G. to determine the applicable fine range yields the following analysis:

a) The 2016 U.S.S.G. are applicable to this matter.

b) <u>Offense Level</u>. Based on U.S.S.G. §8A1.2(b)(2)(B) and §2B1.1, the offense level is 36, calculated as follows:

| | | |
|---|---|---|
| o §2B1.1(a)(2) | Base Offense Level: | 6 |
| o §2B1.1(b)(1)(N) | Gain of more than $150 million: | +26 |
| o §2B1.1(b)(2)(A) | More than 10 victims: | +2 |

6

     o §2B1.1(b)(10(B)     Substantial part of scheme committed outside of United States:     <u>+2</u>

**TOTAL**     **36**

c) <u>Base Fine</u>. Based on U.S.S.G. §8C2.4(a)(2), the base fine is $203,572,892 (Gain to the defendant resulting from the offense).

d) <u>Culpability Score</u>. Based on U.S.S.G. §8C2.5, the culpability score is 5, based on the following factors:

     o §8C2.5(a)     Base culpability score:     5

     o §8C2.5(b)(4)     The organization had 50 or more employees and personnel in position of substantial authority participated in, condoned, or was willfully ignorant of the offense:     +2

     o §8C2.5(g)(2)     Organization cooperated in investigation and affirmatively accepts responsibility for its misconduct:     <u>-2</u>

**TOTAL**     **5**

e) Calculation of Fine Range:

     o Base Fine (U.S.S.G. §8C2.4(a)(2)):     $203,572,892

     o Multipliers (U.S.S.G. §8C2.6):     1.00-2.00

     o Fine Range (U.S.S.G. §8C2.7):     $203,572,892-$407,145,784

     o Credit to Applicable Fine Range: Civil monetary penalties paid to the United States and the State of California based on the underlying offense conduct totaling     $311,000,000.

     o Final Fine Range:     0-$96,145,784.

**3.    Sentence**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Offices and the Defendant agree that the appropriate disposition of this case is as set forth in this Section and jointly agree that the Court impose the sentence set forth herein.

**A.    Relevant Considerations**

The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

1. the nature and seriousness of the offense conduct as described in Attachment B;

2. the Defendant did not receive voluntary disclosure credit pursuant to the Corporate Enforcement Policy in the Department of Justice Manual ("JM") § 9.47.120, or pursuant to the Sentencing Guidelines, because it did not voluntarily and timely disclose to the Offices the conduct described in the Statement of Facts attached hereto as Attachment B;

3. the Defendant received credit for cooperation under U.S.S.G. § 8C2.5(g)(2), because it cooperated with the Offices' investigation, by, among other things, producing voluminous documents to avoid delaying the Offices' investigation and producing documents from a foreign country in ways that did not implicate foreign data privacy law prohibitions; provided to the Offices all relevant facts known to it, including information about the individuals involved in the

8

conduct described in Attachment B and conduct disclosed to the Offices prior to the Agreement; and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct;

4.      the Defendant did not receive credit for remediation pursuant to the Corporate Enforcement Policy, JM § 9-47.120, because the Defendant failed to conduct sufficiently timely or appropriate remedial action, including by failing to take adequate disciplinary measures with respect to certain senior personnel and other employees involved in, or aware of, the conduct described in Attachment B;

5.      the Defendant has enhanced, and has committed to continuing to enhance, its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

6.      the Defendant has agreed to the implementation of enhanced reporting requirements, which are based on (i) the state of the Defendant's compliance program; (ii) its commitment to continuing to enhance its compliance program and internal controls, including implementing the recommendations of the Independent Compliance Auditor imposed in connection with the Consent Decree in *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation,* No. 3:17-md-02777 (N.D. Cal.); (iii) its commitment to ensuring that its compliance program satisfies the elements set forth in Attachment C to this

9

Agreement; and (iv) the Defendant's agreement to meet with and report to the Offices as set forth in Attachment D to this Agreement (Reporting Requirements); all of which has led the Offices to determine that an independent compliance monitor is unnecessary in this matter;

7.      the Defendant has prior criminal history, namely, a guilty plea related to its role in a conspiracy to violate the Labor Management Relations Act, also known as the Taft-Hartley Act, by making more than $3.5 million in illegal payments to officers of the United Auto Workers Union between 2009 and 2016, *see United States v. FCA US LLC*, No. 21-CR-20031 (E.D. Mich.), which conduct occurred during the same time period as the conduct addressed in Attachment B, in addition the defendant has a limited history of regulatory actions against it;

8.      the Defendant has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Defendant and its officers, directors, employees, agents, business partners, and consultants relating to the violations to which the Defendant is pleading guilty;

Accordingly, after considering (1) through (8) above, the Offices determined that the Defendant should receive a fine at the high end of the applicable U.S. Sentencing Guidelines fine range, which is $407,145,784, but that the Defendant should receive credit for its civil monetary penalty payments totaling $311,000,000

10

based on the same conduct described in Attachment B, and thus that the final criminal fine amount payable under this agreement is $96,145,784.

**B.** **Fine**

The Defendant shall pay to the United States a criminal fine of $96,145,784. This fine amount is payable in full within ten days of the entry of judgment following the sentencing hearing in this matter. The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the fine or forfeiture amounts that Defendant pays pursuant to the Agreement. The Defendant further agrees that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income for any fine or forfeiture paid pursuant to this Agreement.

**C.** **Probation**

The parties agree that a term of organizational probation for a period of three years should be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties further agree, pursuant to U.S.S.G. §8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 5 and 6 below as well as the payment of the fine set forth in Paragraph 3(B), but shall not include the obligations set forth in Paragraphs 7 through 15 below.

11

### D. Special Assessment

The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of Michigan within ten days of the entry of judgment following the sentencing hearing in this matter the mandatory special assessment of $400.

### E. Forfeiture

The Defendant agrees that it gained at least $203,572,892 in proceeds as a result of the conduct described in the Statement of Facts and that such conduct violated 18 U.S.C. § 1343 and 42 U.S.C. § 7413(c)(2)(A). The Defendant agrees to the entry of a forfeiture money judgment against it, in favor of the United States, in the amount of $203,572,892 (the "Forfeiture Amount") under 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c). Defendant agrees to stipulate to the entry of a Preliminary Order of Forfeiture for the Forfeiture Amount at least 2 weeks before sentencing.

The Defendant agrees to pay the Forfeiture Amount within ten days of the entry of judgment following the sentencing hearing in this matter, pursuant to payment instructions provided by the United States Attorney's Office. The Defendant releases any and all claims it may have to the Forfeiture Amount and waives the requirements of any applicable laws, rules or regulations governing the forfeiture of assets, including notice of the forfeiture. If the Defendant does not pay

the Forfeiture Amount, Defendant acknowledges that the forfeiture money judgment may be satisfied with substitute assets under 21 U.S.C. § 853(p)(2). Defendant waives and relinquishes its right to oppose the forfeiture of substitute assets under 21 U.S.C. § 853(p)(1) or otherwise.

### F.      Restitution

Pursuant to Title 18, United States Code, Section 3553(a)(7), in determining a sentence, the Court is required to consider the need to provide restitution to any victims of the offense. If individuals come forward after the entry of the plea, but before sentencing, the Court will determine whether they were directly and proximately harmed by the criminal conduct, and decide whether to impose restitution and any amount of restitution. The parties' view is that no order of restitution is appropriate in this case pursuant to Title 18, United States Code, Section 3663A(c)(3), as the number of identifiable victims is likely to be so large as to make restitution impracticable and/or determining complex issues of fact related to the cause or amount of victims' losses could complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. Moreover, the Defendant has already agreed to compensate members of the class in *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, No. 3:17- md-02777 (N.D. Cal.), and has provided over $183,000,000 in compensation to over 63,000

class members as part of a settlement deemed "fair, adequate, and reasonable" by the Court in that case. The Defendant has also implemented a recall and undertaken remediation measures to mitigate the environmental impact of its criminal conduct. Therefore, given the specific facts and circumstances set forth above, the parties agree that no order of restitution should be issued in this case, and this joint recommendation is a term of this Agreement.

**4.     Other Charges**

In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures relating to any of the conduct described in the Information or Attachment B. The Offices, however, may use any information related to the conduct described in Attachment B to this Agreement against the Defendant: (a) in a prosecution for perjury, obstruction of justice, or making a false statement, apart from a prosecution arising out of the facts and circumstances alleged in the Information and identified in Attachment B; (b) in a prosecution or other proceeding relating to any crime of violence; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Paragraph does not provide any protection against prosecution for any other conduct, including but not limited to crimes committed in the future by the

14

Defendant or by any of its officers, directors, employees, agents or consultants. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the Defendant or natural persons associated with its direct or indirect affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, Attachment B, or in any other matters. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

**5.      The Defendant's Obligations**

A.      Except as otherwise provided in Paragraph 6 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and ending three years from the date on which the Information is filed (the "Term"). The Defendant agrees, however, that, in the event the Offices determine, in their sole discretion, that the Defendant has failed specifically to perform or to fulfill each of the Defendant's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without

15

prejudice to the Offices' right to proceed as provided in Paragraph 9 below. Any extension of the Term extends all terms of this Agreement, including the reporting obligations described in Attachment D, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that the provisions of this Agreement have been satisfied, the Term may be terminated early, except for the Defendant's cooperation obligations described in Paragraph 6 below.

B. The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

1. to plead guilty as set forth in this Agreement;

2. to abide by all sentencing stipulations contained in this Agreement;

3. to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

4. to commit no further crimes;

5. to be truthful at all times with the Court and the Offices;

6. to pay the applicable fine, Forfeiture Amount, and special assessment;

7. to continue to implement a compliance and ethics program designed to prevent and detect fraudulent conduct throughout its operations; and

8. to cooperate with and report to the Offices as provided in

16

Paragraph 6.

C.     The Defendant agrees that any fine or restitution imposed by the Court will be due and payable in full within ten days of the entry of judgment following the sentencing hearing, and the Defendant will not attempt to avoid or delay payment. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Eastern District of Michigan the mandatory special assessment of $400 per count within ten business days from the date of sentencing.

**6.     The Defendant's Cooperation and Reporting Obligations**

A.     The Defendant and its parent corporation, Stellantis N.V. (collectively, "the Stellantis Entities"), shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Attachment B and other conduct under investigation by the Offices during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Stellantis Entities shall also cooperate fully with other domestic law enforcement and regulatory authorities and agencies in any investigation of the Defendant or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to conduct described in this Agreement and Attachment B, and other conduct related to the Defendant's design, calibration, and/or installation of undisclosed Auxiliary Emissions Control

17

Devices ("AECDs") and fraudulent representations pertaining thereto. The Stellantis Entities' cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Stellantis Entities must provide to the Offices timely notice of their intent to rely upon this provision along with a log of any information or cooperation that is withheld based on an assertion of law, regulation, or privilege, and the Stellantis Entities bear the burden of establishing the validity of any such an assertion. The Stellantis Entities agree that their cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

1. The Stellantis Entities shall timely and truthfully disclose all factual information with respect to their activities, those of their affiliates and subsidiaries, and those of their present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Stellantis Entities have any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Stellantis Entities to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Stellantis Entities.

2. Upon request of the Offices, the Stellantis Entities shall designate knowledgeable employees, agents or attorneys to provide to the Offices the

18

information and materials described in Paragraph 6(A)(1) above on behalf of the Stellantis Entities. It is further understood that the Stellantis Entities must at all times provide complete, truthful, and accurate information.

3. The Stellantis Entities shall use best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Stellantis Entities. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

4. With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Stellantis Entities consent to any and all disclosures to other governmental authorities in the United States of such materials as the Offices, in their sole discretion, shall deem appropriate.

B. In addition to the obligations in Paragraph 6(A), during the Term, should the Stellantis Entities learn of any evidence or allegation of a violation of U.S. federal law by or on behalf of the Stellantis Entities and relating to emissions of their vehicles, false or misleading statements made by or on behalf of the Stellantis

19

Entities to U.S. public authorities or regulators, fraud or misrepresentations in the sale or marketing of its or their products in the U.S., or obstruction of any pending or contemplated U.S. federal, state or local investigation or proceeding, the Stellantis Entities shall promptly report such evidence or allegation to the Offices. Thirty days prior to the end of the Term, Stellantis N.V., by the Chief Executive Officer of Stellantis N.V. and the Chief Financial Officer of Stellantis N.V., will certify to the Offices that the Stellantis Entities have met their disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Stellantis Entities to the executive branch of the United States for purposes of Title 18, United States Code, Section 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**7.    Other Obligations**

A.    The Defendant agrees that it will report to the Offices periodically, at no less than three-month intervals during the Term, regarding remediation, implementation, and testing of its compliance program and internal controls, policies, and procedures described in Attachment C. During the Term, the Company shall (i) conduct an initial review and submit an initial report, and (ii) conduct and prepare at least two follow-up reviews and reports, as described in Attachment D of this Agreement.

B.      While the obligation set forth in this Paragraph is not a condition to the term of probation, any failure to comply with the obligation set forth in this Paragraph shall constitute a breach of this Agreement and be subject to the terms set forth in Paragraph 9 below.

**8.      Waiver of Appellate and Other Rights Under United States Law**

A.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants include the following:

1.  the right to plead not guilty and to persist in that plea;

2.  the right to a jury trial;

3.  the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

4.  the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

5.  pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

B.      Nonetheless, the Defendant knowingly waives these rights, including the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described above in Paragraph 1(C) (or the manner in which that

sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge of either the conviction, or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment B or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The

Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

C.      Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

9.      **Breach of Agreement**

A.      If, during the Term of the Agreement, the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate, or the Stellantis Entities fail to cooperate, as set forth in Paragraph 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 3(A)(6) of this Agreement; (e) commits any acts that, had they occurred within the jurisdictional reach of the conspiracy statute, Title 18, United States Code, Section 371, wire fraud statute, Title 18, United States Code, Section 1343, or the Clean Air Act, Title 42, United States Code, Section 7413(c)(2)(A), would be a violation of the conspiracy, wire fraud, or Clean Air Act statutes; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Offices in the U.S. District Court for the Eastern District of Michigan or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion. Any such prosecution may be premised on

information provided by the Defendant. Any such prosecution relating to the conduct described in Attachment B or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 6 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

B.     In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

C.     In the event that the Offices determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the attached Attachment B, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision

26

whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

D.     The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## 10.  Parties to the Plea Agreement

The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. There are collateral consequences that may flow from a felony conviction that cannot fully be predicted by the parties or the Court at the time of sentencing. Those collateral consequences may include, but are not limited to, possible adverse consequences involving permitting, licensure, and authorization at the federal, state, and local levels; debarment; and filings in connection with the Securities and Exchange Commission. Nothing in this plea

27

agreement limits any other federal, state, or local agency or authority from taking actions pursuant to administrative, civil, or criminal authority. The parties understand both the potential consequences discussed above and that there may be additional consequences flowing from a felony conviction and nonetheless willingly enter this plea agreement.

Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that such execution is authorized by the Defendant's Board of Directors, as further represented in Attachment A in the Defendant's Corporate Officer Certificate, and that the Corporate Officer is fully authorized to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant. A fully authorized Corporate Officer of Stellantis N.V. shall also sign this Agreement, in order to ensure that the Stellantis

Entities are bound by and take all necessary steps to effectuate the cooperation and reporting obligations set forth in Paragraph 6 of this Agreement.

The Defendant and the Stellantis Entities agree that they have the full legal right, power, and authority to enter into and perform all of their respective obligations under this Agreement.

## 11. Change in Corporate Form

Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Attachment B of the Agreement attached hereto, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, the Defendant shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction

29

null and void. The Defendant shall provide notice to the Offices at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Defendant engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraph 9 of this Agreement. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

12. **Failure of Court to Accept Agreement**

This Agreement is presented to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea;

and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

**13. Presentence Report**

The Defendant and the Offices waive the preparation of a Presentence Investigation Report. The Defendant understands that the decision whether to proceed with the sentencing without a Presentence Investigation Report is exclusively that of the Court. In the event the Court directs the preparation of a Presentence Investigation Report, the Offices will fully inform the preparer of the Presentence Investigation Report and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing hearing with adequate time for (a) any objections to the Presentence Investigation Report, and (b) consideration by the Court of the Presentence Investigation Report and the parties' sentencing submissions, should the parties elect to make such submissions.

**14. Public Statement by the Defendant**

A. The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or

31

otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment B. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraph 9 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment B will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment B, the Offices shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment B provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment B. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

B. The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

## 15. Complete Agreement

This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR FCA US LLC:**

Date: 5/10/22

By: _____
Christopher Pardi
General Counsel
FCA US LLC

Date: 5/10/22

By: _____
Robert J. Giuffra, Jr.
Theodore Edelman
Nicolas Bourtin
Aisling O'Shea
Sullivan & Cromwell LLP
Outside counsel for FCA US LLC


**FOR THE DEPARTMENT OF JUSTICE:**

JOSEPH S. BEEMSTERBOER
Acting Chief
Fraud Section
Criminal Division

Date: 6/3/22

By: _____
Jason M. Covert
Kyle W. Maurer
Michael P. McCarthy
Trial Attorneys

TODD KIM
Assistant Attorney General

34

Environment and Natural
Resources Division

Date:  6-3-22

By:  Todd W. Gleason (JN)

Todd W. Gleason
Senior Trial Attorney

DAWN N. ISON
United States Attorney
Eastern District of Michigan

Date:  6-3-22

By:  John K. Neal

John K. Neal
Chief, White Collar Crime Unit
Timothy J. Wyse
Assistant United States Attorney

A-1

**ATTACHMENT A**

**CORPORATE RESOLUTIONS AND
CERTIFICATE OF COUNSEL**

Copies of the executed Certificates of Corporate Resolutions and Certificate

of Counsel are annexed hereto as "Attachment A."

## FCA US CERTIFICATE OF CORPORATE RESOLUTIONS

At a duly held meeting on April 25, 2022, the Board of Directors (the "Board") of FCA US LLC (the "Company") resolved as follows:

**WHEREAS**, the Company, through its external legal counsel, has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively, the "Offices") in connection with the Offices' investigation into potential criminal violations related to the 2014-2016 Model Year EcoDiesel Ram 1500 and Jeep Grand Cherokee (the "Investigation");

**WHEREAS**, the Board has been advised by its external legal counsel of the terms of the Information and Plea Agreement, with Attachments, as circulated to the Board (collectively, the "Plea Agreement"), including but not limited to, the payment of a criminal fine; and

**WHEREAS**, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the Offices with respect to criminal violations identified during the Investigation and that no additional promises or representations have been made to the Company by any representatives of the Offices in connection with the disposition of the Investigation, other than those set forth in the Plea Agreement.

**THEREFORE**, this Board hereby **RESOLVES** that:

1. The Board authorizes the Company to: (a) consent to the filing of a one-count Information in the United States District Court for the Eastern District of Michigan charging the Company with conspiring with others, in violation of Title 18, United States Code, Section 371, to defraud the United States, to commit wire fraud, Title 18 United States Code, Section 1343, and to violate the Clean Air Act, Title 42, United States Code, Section 7413(c)(2)(A); (b) waive indictment on such charge; (c) waive its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (d) consent to conducting all proceedings, including a plea hearing, either in-person or via video or telephonic conference as provided for by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") and hereby waives any right to be

A-2

present for such proceedings under the Sixth Amendment to the United States Constitution and Federal Rules of Criminal Procedure 11 and 43; and (e) agree to pay a criminal fine of $96,145,784 and a Forfeiture Amount of $203,572,892 to the United States Treasury.

2. The Board acknowledges that it is in the best interests of the Company to enter the guilty plea provided for, and agree to the terms provided in, the Plea Agreement with the Offices in substantially the form and substance set forth in the form of the Plea Agreement presented to this Board;

3. The Board authorizes the Company to enter into and perform the Company's obligations under the Plea Agreement;

4. The Board authorizes, empowers and directs the Company's Chief Executive Officer and General Counsel (each an "Authorized Officer"), and the Company's external legal counsel, Sullivan & Cromwell LLP ("External Counsel"), to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board, with such changes as any Authorized Officer may approve;

5. The Board authorizes, empowers and directs the Authorized Officers and External Counsel to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolution (including execution and delivery of any such agreement or document on behalf of the Company);

6. The Board hereby authorizes and empowers the Authorized Officers and External Counsel to act and speak on behalf of the Company in any proceeding or as otherwise necessary for the purpose of executing the Plea Agreement, including entry of a guilty plea in court on behalf of the Company;

7. All of the actions of any Authorized Officer or External Counsel, which would have been within the scope of and authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as authorized actions of the Company; and

A-3

8. The Authorized Officers and External Counsel are individually authorized, empowered or directed to provide to the Offices a certified copy of these resolutions.

I hereby certify that the above is a true and accurate copy of the resolutions of the Board of the Company passed on April 25, 2022.

Date: April 29, 2022   By: _____

            Christopher Pardi
            General Counsel
            FCA US LLC

## STELLANTIS NV CERTIFICATE OF CORPORATE RESOLUTIONS

Following a duly held meeting on April 13, 2022, the Board of Directors (the "Stellantis Board") of Stellantis N.V. ("Stellantis") resolved as follows:

**WHEREAS**, Stellantis's subsidiary, FCA US LLC (the "Company"), through its external legal counsel, has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively, the "Offices") in connection with the Offices' investigation into potential criminal violations related to the 2014-2016 Model Year EcoDiesel Ram 1500 and Jeep Grand Cherokee (the "Investigation");

**WHEREAS**, the Stellantis Board has been advised by its external legal counsel of the terms of the Plea Agreement, with Attachments between the Company and Offices, as circulated to the Board (collectively, the "Plea Agreement"); and

**WHEREAS**, the Stellantis Board acknowledges that it has been informed that Section 6 of the Plea Agreement fully sets forth the Company's agreement with the Offices and that no additional promises or representations have been made to the Company by any representatives of the Offices in connection with the disposition of the Investigation, other than those set forth in the Plea Agreement.

**THEREFORE**, this Stellantis Board hereby **RESOLVES** that:

1. The Stellantis Board authorizes Stellantis to acknowledge: (a) the filing of a one-count Information in the United States District Court for the Eastern District of Michigan charging FCA US LLC (the "Company") with conspiring with others, in violation of Title 18, United States Code, Section 371, to commit wire fraud, Title 18 United States Code, Section 1343, to defraud the United States and to violate the Clean Air Act, Title 42, United States Code, Section 7413(c)(2)(A); (b) the waiver by the Company of its indictment on such charge; (c) the waiver by the Company of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (d) the Company's consent to conducting all proceedings, including a plea hearing, either in person or via video or telephonic conference as provided for by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") and waiver of any right to be present for such proceedings under the Sixth Amendment to the United

States Constitution and Federal Rules of Criminal Procedure 11 and 43; and (e) the Company's undertaking of the obligations provided in Section 6 of the Plea Agreement with the Offices;

2. The Stellantis Board acknowledges and accepts the Company's determination that it is in the best interests of the Company to agree to the terms provided in Section 6 of the Plea Agreement with the Offices in substantially the form and substance set forth in the form of the Plea Agreement presented to the Stellantis Board;

3. The Stellantis Board authorizes Stellantis and the Company to enter into and perform the obligations under Section 6 of the Plea Agreement, which requires among other things that Stellantis and the Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in the Plea Agreement and other conduct under investigation by the Offices during the term specified in the Plea Agreement;

4. The Stellantis Board authorizes, empowers and directs the Company's Chief Executive Officer and General Counsel (each an "Authorized Officer"), and the Company's and Stellantis's external legal counsel, Sullivan & Cromwell LLP ( "External Counsel"), to execute and deliver the Plea Agreement, substantially in such form as reviewed by the Stellantis Board, with such changes as any Authorized Officer may approve;

5. The Stellantis Board authorizes, empowers and directs the Authorized Officers and External Counsel to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolution (including execution and delivery of any such agreement or document on behalf of the Company);

6. The Stellantis Board acknowledges and accepts the Company's authorization and empowerment of the Authorized Officers and External Counsel to act and speak on behalf of the Company in any proceeding or as otherwise necessary for the purpose of executing the Plea Agreement;

7. The Stellantis Board acknowledges and accepts the Company's determination that all of the actions of any Authorized Officer or External

Counsel, which would have been within the scope of and authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as authorized actions of the Company; and

8. The Authorized Officers and External Counsel are individually authorized, empowered or directed to provide to the Offices a certified copy of these resolutions.

I hereby certify that the above is a true and accurate copy of the resolutions of the Stellantis Board passed on May 10, 2022.

Date: May 10, 2022

By: _____
Giorgio Fossati
General Counsel
Stellantis N.V.

## CERTIFICATE OF COUNSEL

I am counsel for FCA US LLC (the "Defendant") and Stellantis N.V. ("Stellantis") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (the "Agreement"). In connection with such representation, I have examined relevant documents and have discussed, or caused to be discussed by counsel, the terms of the Agreement with the respective Boards of Directors of the Defendant and Stellantis. Based on my review of the foregoing materials and discussion, I am of the opinion that the representative of the Defendant has been duly authorized to enter into the Agreement on behalf of the Defendant and that the Agreement has been duly and validly authorized, executed and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant. Further, I have carefully reviewed, or caused to be reviewed by counsel, the terms of the Agreement with the respective Boards of Directors of the Defendant and Stellantis. I have fully advised them, or caused them to be advised, of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement. To my knowledge, the decision of the Defendant to enter into the Agreement, with the

A-8

consent of the respective Boards of Directors of the Defendant and Stellantis, is an

informed and voluntary one.

Dated: 5/10/22          By: _____

Robert J. Giuffra, Jr.
Sullivan & Cromwell LLP

A-9

## ATTACHMENT B

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively "the Offices") and FCA US LLC ("FCA US"). FCA US hereby agrees and stipulates that the following information is true and accurate. FCA US admits, accepts, and acknowledges that under U.S. law it is responsible for the acts of its employees and agents as set forth in this Statement of Facts, which acts FCA US acknowledges were within the scope of the employees' and agents' employment and, at least in part, for the benefit of FCA US. All references to legal terms and emissions standards, to the extent contained herein, should be understood to refer exclusively to applicable U.S. laws and regulations, and such legal terms contained in this Statement of Facts are not intended to apply to, or affect, FCA US's rights or obligations under the laws or regulations of any jurisdiction outside the United States. This Statement of Facts does not contain all of the facts known to the Department or FCA US; the Department's investigation into individuals is ongoing. The following facts took place during the time frame specified in the Information and establish beyond a

B-1

reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

**Relevant Entities and Individuals**

1.      Stellantis N.V. ("Stellantis"), the successor in interest to Fiat Chrysler Automobiles N.V. ("FCA NV") by means of a merger that became effective in January 2021, was a motor vehicle manufacturer headquartered in Amsterdam, Netherlands.

2.      FCA US LLC ("FCA US"), formerly Chrysler Group LLC, was a motor vehicle manufacturer based in Auburn Hills, Michigan, and a wholly owned subsidiary of Stellantis or its predecessors. Under U.S. law, FCA US acted through its employees and agents, and conduct undertaken by FCA US, as described herein, reflects conduct undertaken by its employees and agents.

3.      FCA Italy S.p.A. ("FCA Italy"), was a motor vehicle manufacturer based in Turin, Italy, and a wholly owned subsidiary of Stellantis or its predecessors.

4.      VM Motori S.p.A. ("VM") was a diesel engine manufacturing company based in Cento, Italy, with U.S. offices in Auburn Hills, Michigan. Beginning in 2010, Stellantis' predecessors, including FCA N.V., indirectly owned 50% of VM. Beginning in April 2014, VM was a wholly and indirectly owned subsidiary of FCA N.V. or its predecessors, and it remains a wholly and indirectly owned subsidiary of Stellantis.

B-2

5. "Jeep" was a brand of Stellantis or its predecessors, which developed vehicles to be sold under the "Jeep" brand name, including the Jeep Grand Cherokee.

6. "Ram Trucks" was a brand of Stellantis or its predecessors, which developed vehicles to be sold under the "Ram Trucks" brand name, including the Ram 1500.

7. Emanuele Palma was a Senior Diesel Calibration Manager for FCA US based in Auburn Hills, Michigan. Palma led a team of engineers that developed and calibrated the diesel engines in the Subject Vehicles from in or about 2012 until at least in or about September 2017. From in or about 2012 until in or about March 2014, Palma worked on the Subject Vehicles as an employee of VM and agent of FCA US. In or about April 2014, Palma became an employee of FCA Italy and continued to work on the Subject Vehicles from Auburn Hills, Michigan, as an agent of FCA US. In or about January 2015, Palma joined FCA US on international assignment, during which time he was paid directly by FCA US, supervised FCA US employees, and received his performance reviews from an FCA US supervisor. In or about June 2016, Palma became a direct employee of FCA US. At the time of this agreement, Palma remained employed at FCA US as a Senior Calibrations Engineer, although FCA US suspended him with pay in September 2019.

8. Sergio Pasini was a Cento Operations Lead for FCA Italy. Pasini was previously a head calibration engineer for VM, based in Cento, Italy, who directly

B-3

supervised Palma and managed the development of controls and calibrations associated with the Subject Vehicles from in or about 2010 until at least in or about September 2017. From in or about 2010 until in or about March 2014, Pasini worked on the Subject Vehicles as an employee of VM and agent of FCA US. In or about April 2014, Pasini became an employee of FCA Italy and continued to work on the Subject Vehicles as an agent of FCA US until at least in or about September 2017. At the time of this agreement, Pasini remained employed at FCA Italy as the Cento Operations Lead, although FCA Italy suspended him with pay in May 2021.

9. Gianluca Sabbioni was a Diesel Testing Manager for FCA Italy. Sabbioni was previously a technical director for VM, based in Cento, Italy, who directly supervised Pasini and oversaw the development of the Subject Vehicles from in or about 2010 until at least in or about September 2017. Sabbioni reported directly to the CEO of VM and worked with executives at FCA US on the Subject Vehicles. From in or about 2010 until in or about March 2014, Sabbioni worked on the Subject Vehicles as an employee of VM and agent of FCA US. In or about April 2014, Sabbioni became an employee of FCA Italy and continued to work on the Subject Vehicles as an agent of FCA US until at least in or about September 2017. At the time of this agreement, Sabbioni remained employed at FCA Italy as a Diesel Testing Manager, although FCA Italy suspended him with pay in May 2021.

10.     Co-Conspirator 1 was a calibrations engineer based in Auburn Hills, Michigan, who worked on the Subject Vehicles from in or about 2012 until at least in or about September 2017. From in or about 2012 until in or about March 2014, Co-Conspirator 1 worked on the Subject Vehicles as an employee of VM and agent of FCA US. In or about April 2014, Co-Conspirator 1 became an employee of FCA Italy and continued to work on the Subject Vehicles from Auburn Hills, Michigan, as an agent of FCA US. In or about January 2015, Co-Conspirator 1 joined FCA US on international assignment, during which time he continued to work on the Subject Vehicles and was paid directly by FCA US. In or about August 2016, Co-Conspirator 1 became a direct FCA US employee. Co-Conspirator 1 voluntarily resigned from FCA US in or about January 2019.

11.     Co-Conspirator 2 was an Emissions/Calibrations Team Lead for FCA Italy. Co-Conspirator 2 was previously an Emissions/Calibration Manager for VM, based in Cento, Italy, who worked on the Subject Vehicles from in or about 2010 until at least in or about September 2017. From in or about 2010 until in or about March 2014, Co-Conspirator 2 worked on the Subject Vehicles as an employee of VM and agent of FCA US. In or about April 2014, Co-Conspirator 2 became an employee of FCA Italy and continued to work on the Subject Vehicles as an agent of FCA US until at least in or about September 2017. Co-Conspirator 2 voluntarily resigned from FCA US in or about June 2020.

B-5

**FCA US's Diesel Vehicles Sold in the United States**

12.     Beginning in at least 2010, FCA US started a program to develop a new 3.0-liter diesel engine for use in FCA US's Jeep Grand Cherokee and Ram 1500 vehicles that would be sold in North America, including in the United States.

13.     Between 2010 and continuing until at least 2017, FCA US worked with VM to develop and calibrate the new 3.0-liter diesel engine, and to obtain regulatory approval to sell the new diesel vehicles in the United States.

14.     Beginning in 2013, FCA US sold, offered for sale, introduced into commerce, delivered for introduction into commerce, and imported into the United States (collectively, "sold in the United States") the following vehicles with the new 3.0-liter diesel engine (the "Subject Vehicles"):

a.     Model Years 2014-2016 Jeep Grand Cherokee; and

b.     Model Years 2014-2016 Ram 1500.

15.     During both the design phase and the marketing phase of the Subject Vehicles, FCA US represented to its regulators and potential customers that the Subject Vehicles met the relevant United States regulatory standards, including regulatory standards governing the emissions of pollutants.

**FCA US's Regulators in the United States**

The Environmental Protection Agency

16.     Nitrogen oxides or "NOx" are a family of gaseous pollutants that form when diesel or other fuels are burned at high temperatures. Motor vehicles using diesel engines may produce and emit NOx during normal vehicle operation.

17.     The Environmental Protection Agency ("EPA") was an independent agency of the United States charged with implementing and enforcing standards for air quality, water quality, and individual pollutants, including NOx.

18.     The Clean Air Act and its implementing regulations (collectively, "the Clean Air Act") were designed to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles. The Clean Air Act required the EPA to promulgate standards for emissions of pollutants from new motor vehicles, including NOx.

19.     In 1994, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers. Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I. For light-duty vehicles, the regulations required manufacturers like FCA US to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004, and required manufacturers like FCA US to fully comply with the stricter standards for model year 2007 for light-duty vehicles.

20. The Clean Air Act prohibited manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle or engine (a) complied with emissions standards, including NOx emissions standards, and (b) was issued an EPA certificate of conformity ("COC") as required by the Clean Air Act.

21. The EPA used a series of federal test procedures (hereinafter, the "federal test procedures") to measure both tailpipe emissions of NOx and other pollutants, as well as fuel economy for new motor vehicles offered for sale in the United States. During these federal test procedures – commonly referred to as driving "cycles" – motor vehicles would be placed on a device called a chassis dynamometer, which allowed the motor vehicle engine to run through simulated driving conditions while tailpipe emissions and fuel economy were tested. Each driving "cycle" was generally designed to simulate certain types of driving conditions, and to assess emissions and fuel consumption under those conditions. The EPA permitted manufacturers like FCA US to conduct the required federal test procedures for new vehicles themselves, and to submit the certified results of those tests or driving "cycles" as part of their application for a COC.

22. Manufacturers like FCA US were required to include information about the certified EPA results of the federal test procedures in a label affixed to the

B-8

window of new vehicles when they were offered for sale to the public. Among other things, FCA US's labels stated that the vehicles were "manufactured to meet specific United States requirements" and contained "EPA/DOT Fuel Economy and Environment" information, including the Subject Vehicles' EPA-certified fuel economy ratings and emissions information, which were determined using EPA federal test procedures.

23. Under the Clean Air Act, manufacturers like FCA US were required to submit an application for a COC to the EPA for each model year ("MY"), and for each test group of vehicles that it intended to sell in the United States. The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include the results of testing done pursuant to the published federal test procedures that measure NOx emissions.

24. In addition, manufacturers like FCA US were required to include in the application descriptions of the engine, emissions control systems, and fuel system components, including a description and justification for each Auxiliary Emission Control Device ("AECD") installed in the vehicle. An AECD was defined by EPA pursuant to the implementing regulations as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."

B-9

25.     Under the Clean Air Act, if the EPA in reviewing the application for a COC determined that an AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the federal test procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD could be deemed a "defeat device." The EPA would not issue a COC for motor vehicles equipped with defeat devices.

The California Air Resources Board

26.     As part of the process for obtaining approval to sell new vehicles, manufacturers like FCA US often worked in parallel with the EPA and the California Air Resources Board ("CARB") (collectively, the "U.S. Regulators"). CARB issued its own certificates, called Executive Orders, for the sale of motor vehicles in the State of California. In order to obtain an Executive Order from CARB and sell cars in the State of California, manufacturers like FCA US were required to satisfy the standards set and enforced by the State of California.

27.     In addition to demonstrating compliance with federal emissions standards, manufacturers like FCA US were also required to demonstrate that their light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring emissions-related systems or components. Because CARB's

B-10

OBD standards were at least equal to the federal OBD standards that were enforced and set by the EPA, manufacturers like FCA US could demonstrate compliance with federal OBD standards by demonstrating compliance with CARB's OBD standards. CARB reviewed applications from manufacturers like FCA US to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application manufacturers submitted to the EPA.

**FCA's Applications for the Subject Vehicles**

28. Between 2013 and continuing through 2016, FCA US prepared and submitted applications for COCs to the EPA, and applications for Executive Orders to CARB (collectively, the "Applications"), in order to obtain authorization to sell the Subject Vehicles in the United States.

29. FCA US's Applications to the EPA for the Subject Vehicles were accompanied by the following statement signed by an FCA US representative:

> [Chrysler Group LLC/FCA US] states that any element of design, system, or emission control device installed on or incorporated in [Chrysler Group LLC/FCA US] new motor vehicles or new motor vehicle engines, for the purpose of complying with standards prescribed under Section 202 of the Clean Air Act, will not, to the best of [Chrysler Group LLC/FCA US]'s information and belief, cause the emission into the ambient air of pollutants in the operation of its motor vehicles or motor vehicle engines which cause or contribute to an unreasonable risk to public health or welfare except as specifically permitted by the standards prescribed under Section 202 of the Clean Air Act. [Chrysler Group LLC/FCA US] further states that any element of design, system, or emission control device installed on or incorporated in [Chrysler

B-11

Group LLC/FCA US]'s new motor vehicles or new motor vehicle engines, for the purpose of complying with standards prescribed under Section 202 of the Clean Air Act, will not, to the best of [Chrysler Group LLC/FCA US]'s information and belief, cause or contribute to an unreasonable risk to public safety.

. . .

The motor vehicles were tested in accordance with good engineering practice to ascertain that such test vehicles will meet with requirements for the useful life of the vehicle in those situations where [Chrysler Group LLC/FCA US] had a reasonable basis for suspecting either an unsafe condition or the emission of noxious or toxic matter.

. . .

[Chrysler Group LLC/FCA US] further states to the best of its knowledge and belief the test vehicles, with respect to which data are submitted, were tested in accordance with the applicable test procedures, meet the requirements of such tests, and, on the basis of such tests, conform to the requirements of the regulations.

30.     Based on the representations made by FCA US in the Applications for the Subject Vehicles, including FCA US's representations that all AECDs had been disclosed to the U.S. Regulators, the U.S. Regulators issued COCs and Executive Orders that permitted FCA US to sell the Subject Vehicles in the United States.

31.     FCA US represented to its U.S. customers, U.S. dealers, the U.S. Regulators, and others in the United States that the Subject Vehicles met the new and stricter U.S. emissions standards identified in Paragraph 19 above. Further, FCA US designed a specific marketing campaign to market these vehicles to U.S. customers as "clean EcoDiesel" vehicles with best-in-class fuel efficiency.

B-12

**The Primary Emissions Control Systems Used on the Subject Vehicles**

32. Diesel-fueled motor vehicles can use a combination of emissions control systems to comply with the relevant emissions standards. The two primary emissions control systems used by FCA US on the Subject Vehicles to control NOx emissions were an engine control system called "Exhaust Gas Recirculation," or "EGR," and an after-treatment system called Selective Catalytic Reduction, or "SCR."

33. EGR systems work to reduce NOx emissions by recirculating a portion of the exhaust gas back to the engine's combustion chamber, which lowers both the combustion temperature and the oxygen concentration in the chamber, and thereby reduces the formation of NOx in the engine.

34. As a general principle, an increase in the EGR rate will reduce NOx formation in the engine, but will also reduce fuel economy, while a reduction in the EGR rate will increase NOx formation in the engine but will also have the benefit of increasing fuel economy.

35. SCR after-treatment systems work to reduce NOx emissions through a chemical reaction prior to emission of exhaust from the tailpipe of the motor vehicle. SCR systems inject an ammonia solution into the exhaust stream at a calibrated dosing rate in order to produce a chemical reaction to convert NOx to nitrogen and water.

B-13

36. The ammonia solution used by FCA in the Subject Vehicles' SCR system was known as diesel exhaust fluid ("DEF"), urea, or by its trade name, AdBlue. In the Subject Vehicles, the DEF used in the SCR system was stored in a tank, and when the SCR system used up the available DEF, the owner of the vehicle would need to refill the tank with additional DEF.

37. As a general principle, an increase in the DEF dosing rate will remove more NOx from the exhaust stream, but also increase the SCR system's consumption of DEF, while a decrease in the DEF dosing rate will remove less NOx from the exhaust stream, but also have the benefit of reducing the SCR system's consumption of DEF.

38. FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, installed and calibrated software features in the Subject Vehicles, including T_Eng, Online Dosing, and the Valve Train Cleaning Routine. These features were used as cycle-beating strategies to help the Subject Vehicles meet the required emissions standards, while maintaining features that would make them more attractive to consumers, including with respect to fuel efficiency, service intervals, and performance.

39. For instance, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, installed and calibrated the software feature known as "T_Eng" to control the engine's EGR rate. By using T_Eng and other

methods to control the engine's EGR rate, FCA US decided when and under what conditions the engine would produce higher NOx emissions with higher fuel economy, and when and under what conditions the engine would produce lower NOx emissions with lower fuel economy.

40. Similarly, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, installed and calibrated software features known as "Standard Dosing" and "Online Dosing" to control the SCR system's DEF dosing rate. These two different dosing modes were calibrated based on judgments made by Palma, Pasini, Sabbioni, and others involved in the development of the engine. By using two different dosing modes to control the DEF dosing rate, FCA US decided when and under what conditions the SCR system would produce higher NOx emissions with reduced DEF consumption, and when and under what conditions the SCR system would produce lower NOx emissions with higher DEF consumption.

41. FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, also installed and calibrated a software feature known as the Valve Train Cleaning Routine. The Valve Train Cleaning Routine was a timer-based software strategy that initiated after 30 minutes of engine operation to shut off the Subject Vehicles' EGR system for five minutes. The 30-minute initiation timer for the routine was specifically chosen so that it would not activate and affect emissions during any federal test cycle. . FCA US implemented the Valve Train Cleaning

B-15

Routine during development of Subject Vehicles after encountering an issue related to engine shudder, which caused the Subject Vehicles to noticeably shake.

**The Conspiracy and Scheme**

42. From at least as early as 2010 and continuing through at least September 2017, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, and did, mislead the U.S. Regulators and U.S. customers by making false and misleading representations about the design, calibration, and function of the emissions control systems used on the Subject Vehicles, the emission of pollutants from the Subject Vehicles, and the Subject Vehicles' fuel efficiency and compliance with U.S. emissions standards.

43. As set forth below, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, purposely calibrated the EGR and SCR systems on the Subject Vehicles to produce less NOx emissions on the federal test procedures than when the Subject Vehicles were being driven by FCA US's customers in the real world. FCA US through Palma, Pasini, Sabbioni, and other current or former VM employees, then engaged in deceptive and fraudulent conduct to conceal the emissions impact and function of the emissions control systems from its U.S. Regulators and U.S. customers by (a) submitting false and misleading Applications to the U.S. Regulators, (b) making false and misleading representations to the U.S. Regulators both in person and in response to written requests for information, and

(c) making false and misleading representations to consumers about the Subject Vehicles in advertisements and in window labels, including that the Subject Vehicles complied with U.S. emissions requirements, had best-in-class fuel efficiency as measured by EPA testing, and were equipped with "clean EcoDiesel engine[s]" that reduced emissions.

44. In order to mislead the U.S. Regulators and U.S. customers, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, used a variety of manner and means to accomplish their unlawful purpose, including as follows:

45. *First*, FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, purposely calibrated the emissions control system to produce (a) lower NOx emissions under conditions when the Subject Vehicles would be undergoing testing on the federal test procedures or driving "cycles," and (b) higher NOx emissions when the Subject Vehicles would be driven under real world conditions, and not subjected to testing on the federal test procedures or driving "cycles."

46. By calibrating the emissions control system on the Subject Vehicles to produce lower NOx emissions while the vehicles were on the driving "cycle," and higher NOx emissions when the vehicles were off the driving "cycle," or "off cycle," FCA US purposely misled the U.S. Regulators by making it appear that the Subject

B-17

Vehicles were producing less NOx emissions than when operated in real world driving conditions.

47.    FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, installed and calibrated the T_Eng software to lower NOx emissions by increasing the EGR rate when the vehicles were being tested for emissions on the federal driving "cycle." Conversely, when the Subject Vehicles were undergoing other portions of the federal test procedures, such as when the vehicles were being tested for fuel economy, or when the Subject Vehicles were "off cycle," i.e., not undergoing federal testing but instead being driven by customers, FCA US increased the NOx emissions of the Subject Vehicles by using the T_Eng software and other methods to lower the EGR rate.

48.    FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, purposely lowered the EGR rate using the T_Eng software when the vehicles were not being tested for emissions on the federal driving cycle to fraudulently generate favorable fuel efficiency ratings for the Subject Vehicles. FCA US used these false and fraudulent fuel efficiency ratings to make the Subject Vehicles more attractive to U.S. consumers by marketing the Subject Vehicles as having best-in-class fuel efficiency and by providing false and misleading emissions and fuel efficiency information in the Subject Vehicles' labels.

B-18

49. Palma, Pasini, Sabbioni, and others referred to the manner in which they manipulated the EGR rate using the T_Eng software as "cycle detection" and "cycle beating." Without the "cycle beating" use of the T_Eng software, the Subject Vehicles were unable to pass the emissions portions of the federal test procedures while also receiving a fuel efficiency rating that could be marketed to FCA US's potential customers as "best-in-class," consistent with FCA US's 3.0-liter diesel program's goals, timing, and marketing strategy.

50. FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, calibrated the SCR system to produce lower NOx emissions by increasing the DEF dosing rate when the vehicles were being tested for emissions on the federal driving "cycle." Conversely, when the Subject Vehicles were "off cycle," i.e., not undergoing federal testing but instead being driven by customers, FCA US designed the Subject Vehicles to emit higher levels of NOx by reducing the DEF dosing rate. FCA US purposely reduced the DEF dosing rate "off cycle" in order to increase the number of miles the Subject Vehicles could be driven before the DEF tank would need to be refilled, in an effort to make the vehicles more attractive to its potential customers, while also passing the emissions tests. FCA US referred to the increased DEF dosing rate when the Subject Vehicles were "on cycle" as "Standard Dosing," and the reduced DEF dosing rate when the Subject Vehicles were "off cycle" as "Online Dosing."

51. ***Second***, because FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators knew that the decision to calibrate the emissions control system used on the Subject Vehicles to perform differently "on cycle" versus "off cycle" would be subjected to significant scrutiny by the U.S. Regulators, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, made false and misleading representations to the U.S. Regulators to ensure that they obtained regulatory approval to sell the Subject Vehicles in the United States.

52. Specifically, because disclosure of these emissions control strategies carried a risk that the U.S. Regulators would not agree that these strategies, and the resulting increase in NOx emissions, were justified under the relevant regulations, FCA US, through Palma, Pasini, Sabbioni and other current or former VM employees, concealed that it had calibrated the EGR rate and DEF dosing rates on the Subject Vehicles to perform differently "on cycle" versus "off cycle." FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, also concealed that it calibrated the emissions control systems to increase emissions under conditions that it believed would make the Subject Vehicles more attractive to its potential customers, i.e., by increasing fuel economy and reducing the SCR system's DEF consumption.

53. In order to prevent the U.S. Regulators from reviewing and understanding the true impact of the emissions control system used on the Subject

Vehicles, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, engaged in deceptive and fraudulent conduct, including (a) concealing from the U.S. Regulators their manipulation of EGR rates and their use of two different DEF dosing modes, (b) making false and misleading representations to the U.S. Regulators in the Applications submitted for the Subject Vehicles, and (c) making false and misleading representations to the Regulators in written submissions and during in-person meetings that were held for the purpose of discussing the emissions control system used in the Subject Vehicles.

54.    *Third*, FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, deceived customers and potential customers through false and misleading representations that the Subject Vehicles had "clean EcoDiesel engines," were fully approved and certified by the U.S. Regulators, and had best-in-class fuel efficiency. FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, was directly responsible for these false and misleading representations that were made to customers in FCA US's advertisements and in the window label displayed on each Subject Vehicle.

False and Misleading Clean Air Act Submissions

55.    On or about December 23, 2014, FCA US, through Palma, Pasini, Sabbioni, and and other current or former VM employees, submitted to the U.S.

Regulators the final MY14 Common Application for the Subject Vehicles that contained false and misleading representations.

56. On or about February 26, 2015, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, submitted to the U.S. Regulators the initial MY16 Common Application for the Subject Vehicles that contained false and misleading representations.

57. On or about November 17, 2015, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, submitted to the U.S. Regulators an AECD list for the MY14 Subject Vehicles that contained false and misleading representations.

58. On or about November 23, 2015, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, submitted to the U.S. Regulators an AECD list for its MY16 COC application for the Subject Vehicles that contained false and misleading representations.

59. On or about November 24, 2015, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, submitted to the U.S. Regulators an AECD list for its MY15 COC application for the Subject Vehicles that contained false and misleading representations.

60. On or about March 4, 2016, FCA US, through Palma, Pasini, Sabbioni, and other current or former VM employees, submitted to the U.S. Regulators the

final MY15 Common Application for the Subject Vehicles that contained false and misleading representations.

Deceptive and Fraudulent Conduct in Written Submissions to, and During Meetings with, the U.S. Regulators

61.     In the wake of another automaker's emissions scandal, the EPA notified FCA US in or around September 2015 that it would perform additional emissions testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purpose of investigating a potential defeat device."

62.     FCA US tasked Palma with assisting in its response to the EPA testing, including by gathering and presenting emissions data, drafting written responses to EPA questions, and attending meetings with, and answering questions from, the EPA about the emissions control system used on the Subject Vehicles. FCA US also asked Pasini and Co-Conspirator 2 to assist by gathering and presenting information used in written submissions to EPA questions.

63.     In meetings and written submissions, FCA US, through Palma, Pasini, Co-Conspirator 2, and their co-conspirators, made false and misleading representations to the EPA, including false and misleading misrepresentations about the purpose, function, and emissions impact of (a) T_Eng, (b) "Online Dosing," and (c) the Valve Train Cleaning routine.

B-23

64.    For instance, in September 2015, FCA US tasked Palma with conducting emissions testing based on a protocol designed to simulate road emissions, which included the test vehicle running continuously for more than 35 minutes. Palma shared the results of that testing with employees at FCA US and FCA Italy, including Pasini. Palma explained the results showed that NOx emissions were "clearly higher" when the Valve Train Cleaning Routine was running. However, when FCA US disclosed the Valve Train Cleaning Routine to the EPA in or around November 2015, Palma caused FCA US to falsely claim that "the NOx emission level of the vehicle is not expected to increase."

65.    Similarly, FCA US tasked Palma with attending and presenting information regarding the Subject Vehicle's emissions calibration before the EPA, CARB, and members of DOJ's Civil Division during a June 29, 2016, meeting in Washington, DC. During the June 29, 2016, meeting, FCA US, through Palma, provided false and misleading representations in a PowerPoint presentation and in response to several questions from the U.S. Regulators.

66.    Thereafter, on or about July 29, 2016, the EPA issued a request under the Clean Air Act, commonly referred to as a "208 request," seeking information and documents regarding 62 specific topics related to the Subject Vehicles.

67.    In response to the 208 request, FCA US produced documents, as well as six narrative responses. FCA US submitted those responses concurrently with,

B-24

and before completion of, its conduct of an internal investigation into the matter covered by the 208 requests; and FCA US amended those responses during the course of the 208 process. Each narrative response contained a certification by an FCA US executive signed "under penalty of law" that read, "Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are, to the best of my knowledge and belief, true and complete."

68.     FCA US, through Palma, Pasini, and Co-Conspirator 2, made and caused others to make false and misleading representations, including about T_Eng, Online Dosing, and the Valve Train Cleaning Routine, to the EPA in its 208 narrative responses.

Deceptive and Fraudulent Conduct Related to FCA's Customers

69.     After obtaining the necessary authorization from the U.S. Regulators to sell the Subject Vehicles in the United States, FCA US, marketed the Subject Vehicles to potential customers using false and misleading statements, including that the Subject Vehicles used "clean EcoDiesel engine[s]" that reduced emissions and had best-in-class fuel efficiency.

70.     A primary goal of FCA US's 3.0-liter diesel engine program was to obtain fuel efficiency results that would allow the Subject Vehicles to be marketed and sold to U.S. consumers as best-in-class for fuel efficiency. The purpose of this

fuel efficiency goal was to increase potential sales of the Subject Vehicles by making the vehicles more attractive to consumers. The Subject Vehicles' fuel efficiency was communicated through FCA US advertisements and was also communicated directly to consumers in the window label affixed to each new Subject Vehicle for sale, which contained, among other things, information related to emissions and fuel efficiency.

71.    Another goal of FCA US's 3.0-liter diesel program was to maintain a DEF refill interval of 10,000 miles that matched the standard oil change interval so that consumers would not be required to schedule additional service appointments to maintain the SCR system. The purpose of this program goal was to increase potential sales of the Subject Vehicles by making the vehicles more attractive to consumers.

72.    FCA US communicated the fuel efficiency and 10,000-mile DEF interval goals and their purpose to Palma, Pasini, and Sabbioni. FCA US further communicated to Palma, Pasini, and Sabbioni that failure to obtain an EPA-certified best-in-class fuel efficiency label would jeopardize the 3.0-liter diesel program because the marketing and sale of the Subject Vehicles would be impeded absent such a label.

73.    FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators at VM, implemented T_Eng and Online Dosing into the Subject Vehicles' calibration

B-26

as "cycle beating" strategies to obtain FCA US's desired fuel efficiency label and 10,000-mile DEF interval goals.

74. For example, on or about February 2, 2012, after Co-Conspirator 1 raised concerns among VM colleagues about who would bear the cost of software changes necessary to implement and conceal T_Eng, Palma replied, "[W]e'll go to [FCA US] saying: that's what you need if you want 30 mpg[,]" in reference to FCA US's goal of having a best-in-class fuel efficiency label to display to U.S. customers. Similarly, on or about July 17, 2014, an FCA US employee asked Palma what the effect would be of removing T_Eng from the Subject Vehicles' calibration. Palma responded that the "[Fuel Efficiency] impact is probably around 2 mpg highway." Palma forwarded this exchange using interstate wires to Pasini, their co-conspirators, and other VM employees, and explained that "Chrysler knows tEng is the only way to get to 30 mpg, so don't worry about this topic. [FCA US employee T.L.] will want to be more involved, we need to understand we are, at least partially, responsible of an issue that is creating problems to Chrysler, so we need to 'accept his help.'"

75. Palma and his team conducted regular testing to evaluate whether their calibration changes to the Subject Vehicles could meet or exceed emissions standards and deliver the desired fuel efficiency label. The results of these tests, including their impact on the consumer-facing fuel efficiency label, were routinely sent to Palma, Pasini, Sabbioni, and their co-conspirators at VM. For instance, on or

B-27

about February 8, 2012, Palma, Pasini, Sabbioni, their co-conspirators, and other VM employees received a recap and summary of the Subject Vehicles' recent fuel efficiency testing. Each test summary detailed what "the fuel economy label would be" based on the test results, with the highway fuel efficiency label for two of the three tests resulting in less than 30 mpg and appearing in red font.

76. FCA US tracked the results of Palma's, Pasini's, and Sabbioni's efforts to deliver a label for the Jeep Grand Cherokee containing a highway fuel efficiency rating of 30 mpg, which was a key component of the 3.0-liter diesel program. For instance, on or about March 5, 2012, a high-ranking FCA US employee emailed FCA US's global head of powertrain, copying numerous FCA US and VM employees, including Palma, Pasini, and Sabbioni, and wrote that the "Team has made significant progress but have not demonstrated sufficient confidence to declare we can achieve 30 mpg label." He noted that FCA US was challenging VM "to continue calibration development" in order "to ensure we can achieve a rounded 30 mpg Label."

77. On or about December 18, 2012, after ten months of calibrating the Subject Vehicles with T_Eng, Palma sent an email with a recap of recent fuel efficiency testing to a high-ranking FCA US employee, Pasini, certain co-conspirators, and others. In his email, Palma attached an Excel spreadsheet that detailed the results of more than 90 tests on the Subject Vehicles, including the fuel

efficiency that would appear on the consumer-facing label for each test. Twenty-one of the 40 tests conducted on the two-wheel drive Jeep Grand Cherokee produced FCA US's desired fuel efficiency label of 30 mpg.

78. Ultimately, the consumer-facing window labels that FCA US affixed to each Subject Vehicle falsely stated that the vehicles were "manufactured to meet specific United States requirements." The labels also contained "EPA/DOT Fuel Economy and Environment" information, including false and misleading representations regarding the Subject Vehicles' EPA-certified fuel economy ratings and emissions information. FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, was directly responsible for the false and misleading representations that were communicated to consumers in the window labels.

79. Beginning in or about January 2013, FCA US also began releasing dozens of advertisements using interstate wires, which contained false and misleading representations marketing the Subject Vehicles as having "best-in-class" fuel efficiency and "clean" Eco-Diesel engines. FCA US, through Palma, Pasini, Sabbioni, and their co-conspirators, was directly responsible for the false and misleading representations that were communicated to consumers in these advertisements.

80. In total, between in or about January 2013 and in or about September 2017, FCA US sold approximately 101,482 Subject Vehicles to U.S. consumers who

paid approximately $4,761,008,229 for vehicles that purportedly (a) complied with EPA rules and regulations governing emissions and were thus fully legal to sell in the United States, and (b) obtained "best-in-class" fuel efficiency which complied with EPA-mandated testing. However, these representations, which were material to FCA US's United States customers, were false and misleading. FCA US realized at least $2,006 in profit per vehicle, for a total profit of approximately $203,572,892 from the sale of the Subject Vehicles.

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Clean Air Act, its implementing regulations, and other federal environmental laws concerning vehicle emissions and certification, FCA US LLC (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal controls designed to ensure the making and keeping of fair and accurate records related to the development and submission of documents concerning vehicle emissions and certification required by the Clean Air Act; and (b) a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations of the Clean Air Act, its implementing regulations, and other federal environmental laws concerning vehicle emissions and certification.

### *High-Level Commitment*

1.      The Company will ensure that its directors and senior management

C-1

provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Clean Air Act, its implementing regulations, other federal environmental laws concerning vehicle emissions and certification, and its compliance code.

### *Policies and Procedures*

2.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the Clean Air Act, its implementing regulations, and other federal environmental laws concerning vehicle emissions and certification (collectively, the "federal environmental laws,"), which policy shall be memorialized in a written compliance code.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the federal environmental laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the federal environmental laws by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture

C-2

partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.

4.     The Company will ensure that it has a system of compliance policies and procedures, including a system of internal controls, reasonably designed to ensure the prevention and detection of violations of the federal environmental laws.

### *Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

6.     The Company shall review its compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving regulatory and industry standards.

### *Proper Oversight and Independence*

7.     The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate

C-3

committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### *Training and Guidance*

8.     The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training, or positions that otherwise pose a risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

### *Internal Reporting and Investigation*

C-4

10. The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the federal environmental laws or the Company's compliance code, policies, and procedures.

11. The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the federal environmental laws or the Company's compliance code, policies, and procedures.

### *Enforcement and Discipline*

12. The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13. The Company will institute appropriate disciplinary procedures to address, among other things, violations of the federal environmental laws and the Company's compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting

C-5

from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program is effective.

### *Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

        a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

        b.     informing agents and business partners of the Company's commitment to abiding by the federal environmental laws, and of the Company's compliance code, policies, and procedures; and

        c.     seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the federal environmental laws, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with the federal

C-6

environmental laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the federal environmental laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

### *Mergers and Acquisitions*

16. The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate federal environmental laws due diligence by legal and compliance personnel.

17. The Company will ensure that the Company's compliance code, policies, and procedures regarding the federal environmental laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

    a. train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the federal environmental laws and the Company's compliance code, policies, and procedures regarding the federal environmental laws; and

    b. where warranted, conduct a federal environmental laws audit of all newly acquired or merged businesses as quickly as practicable.

C-7

## *Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of the federal environmental laws and the Company's compliance code, policies, and procedures, taking into account relevant developments in the field and evolving regulatory and industry standards.

## ATTACHMENT D

## COMPLIANCE REPORTING REQUIREMENTS

FCA US LLC (the "Company") agrees that it will report to the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), periodically.

During the Term, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures described in Attachment C. The Company shall be required to: (i) conduct an initial ("first") review and submit a first report and (ii) conduct and prepare at least two follow-up reviews and reports, as described below. Prior to conducting each review, the Company shall be required to prepare and submit a workplan for the review. The Company shall also, at no less than three-month intervals during the Term, meet with the Offices regarding remediation, implementation and testing of its compliance program and internal controls, policies, and procedures described in Attachment C.

In conducting the reviews, the Company shall undertake the following activities, among others: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with the Clean Air Act, its implementing regulations, and other federal

D-1

environmental laws concerning vehicle emissions and certification; (b) inspection and testing of the Company's systems procedures, and internal controls, including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and, comprehensive testing of the Company's compliance program.

### *Written Work Plans, Reviews and Reports*

1.      The Company shall conduct a first review and prepare a first report, followed by at least two follow-up reviews and reports.

2.      Within sixty (60) calendar days of the date this Agreement is executed, the Company shall, after consultation with the Office, prepare and submit a written work plan to address the Company's first review. The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

3.      With respect to each follow-up review and report, after consultation with the Offices, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan.

4.      All written work plans shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of its compliance program, as described in Attachment C.

D-2

5.     Any disputes between the Company and the Offices with respect to any written work plan shall be decided by the Offices in its sole discretion.

6.     No later than one year from the date this Agreement is executed, the Company shall submit to the Offices a written report setting forth: (1) a complete description of its remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) its proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the Clean Air Act, its implementing regulations, and other federal environmental laws concerning vehicle emissions and certification. The report shall be transmitted to:

Deputy Chief – MIMF Unit
Deputy Chief – CECP Unit
Criminal Division, Offices
United States Department of Justice
1400 New York Avenue N.W.
Washington, D.C. 20005

White Collar Chief
United States Attorney's Office
Eastern District of Michigan
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Chief – ECS
Environment and Natural Resources Division
United States Department of Justice
150 M Street N.E.
Washington, D.C. 20002

The Company may extend the time period for issuance of the first report with prior written approval of the Offices.

### *Follow-up Reviews and Reports*

7.     The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Offices on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the Clean Air Act, its implementing regulations, and other federal environmental laws concerning vehicle emissions and certification.

8. The first follow-up ("second") review and report shall be completed by no later than one year after the first report is submitted to the Offices.

D-4

9. The second follow-up ("third") report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

10. The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.

### *Meetings During the Term*

11. The Company shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report.

12. At least quarterly, and more frequently if the Offices deems it appropriate in its sole discretion, representatives from the Company and the Offices will meet to discuss the status of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices.

### *Confidentiality of Submissions*

13. Submissions by the Company, including the work plans and reports, will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except

D-5

to the extent the Offices determines in its sole discretion that disclosure would be in furtherance of the Offices' discharge of its duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**CERTIFICATION**

To:   United States Department of Justice
      Criminal Division, Fraud Section
      Attention:  Chief of the Fraud Section

      United States Attorney's Office
      Eastern District of Michigan
      Attention: Chief of the White-Collar Unit

      United States Department of Justice
      Environment and Natural Resources Division
      Attention: Chief of the Environmental Crimes Section


Re:   Guilty Plea Disclosure Certification

The undersigned certify, pursuant to Paragraph 6 of the Guilty Plea ("Guilty Plea") filed on [DATE, 2022] in the United States District Court for the Eastern District of Michigan, by and between the United States of America and FCA US LLC (the "Company"), that the undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the Guilty Plea, and that the Company has disclosed to the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), any and all evidence or allegations of

E-1

conduct required pursuant to Paragraph 6 of the Guilty Plea, which includes evidence or allegations of any violation of the Clean Air Act, its implementing regulations, or the wire fraud statute committed by the Company's employees and agents upon any domestic government agency, regulator, or any of the Company's customers ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the Guilty Plea and of the Offices' determination whether the Company has satisfied its obligations under the Guilty Plea.

The undersigned hereby certify that they are the Chief Executive Officer and Chief Financial Officer of the Company and that they have been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the

E-2

Eastern District of Michigan. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Eastern District of Michigan.

Date: _____       Name (Printed): _____


Name (Signed): _____
Chief Executive Officer
FCA US LLC


Name (Printed): _____


Name (Signed): _____
Chief Financial Officer
FCA US LLC

E-3